**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 1:05-CR-67 |
| | ) | |
| DARRELL F. JACKSON | ) | |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the court on the Motion to Suppress filed by the Defendant, Darrell

F. Jackson ("Jackson") on December 16, 2005.  The court held an evidentiary hearing on the

motion on January 3, 2006.  At the conclusion of that hearing, the court instructed both Jackson

and the government to file briefs in the case.  Briefing was completed on April 25, 2005.  For the

reasons set forth herein, the motion to suppress is GRANTED.

**FACTUAL BACKGROUND**

On November 16, 2005, a federal grand jury charged Jackson with one count of

possession with intent to distribute base, or "crack," cocaine.  Docket at 1.  Jackson entered a

plea of not guilty on December 5, 2005.  Less than two weeks later, Jackson filed his motion to

suppress.

The charge against Jackson arises out of events that took place in the early morning hours

of July 23, 2005.  At approximately 1:50 a.m. on that date, uniformed officers with the Fort

Wayne Police Department responded to a report of shots fired at an apartment complex named

Eden Green, which is located near the City's downtown area, and within a block of the Fort

Wayne Police Department building.  Officers Douglas Weaver and Ben Truesdale responded to

the scene within a minute or two.  When they arrived at the apartment complex, Weaver and

Truesdale observed Jackson sitting in his black sport utility vehicle, parked in a space in the

complex parking lot.  The officers approached Jackson, questioned him, searched him, and arrested him after discovering drugs in one of Jackson's pockets.  A handgun and approximately $1,500.00 in cash were discovered in Jackson's vehicle after he was arrested.  By the time Jackson was arrested, there were several police officers at the scene.  Also present while all this transpired were several onlookers, mostly people who lived at the apartment complex.  The presence of these witnesses  is a hotly contested fact issue that is crucially important in this case and will be discussed in detail below.  The other facts just recited are not contested.

Jackson filed his present motion seeking to suppress the evidence obtained during this incident, arguing that such evidence is inadmissible since both the search and arrest conducted by the police were in violation of his Fourth Amendment right to be free from unreasonable search and seizure.

## DISCUSSION

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. Amend. IV.  The amendment does not prevent all encounters between the police and citizens.  It comes into play only when a police officer uses physical force or a show of authority to restrain the liberty of a citizen. *United States v. Odum*, 72 F.3d 1279 (7th Cir.1995); *see also United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990) (recognizing three categories of police-citizen encounters: arrest, an investigatory stop, and voluntary encounter with law enforcement).  Indeed, "a police-citizen encounter which involves no restraint on the citizen's liberty, and which is characterized by an officer seeking the citizen's voluntary cooperation through noncoercive questioning, is not a seizure within the meaning of the Fourth Amendment." *United States v. Maldonado*, 38 F.3d 936, 939 (7th Cir. 1994) (citing *Johnson*, 910 F.2d at 1508).

2

Thus, "[v]oluntary encounters between a private person and law enforcement officers are not seizures and, consequently, not subject to the strictures of the fourth amendment." *United States v. Berke*, 930 F.2d 1219, 1221 (7th Cir. 1991).

The determination of precisely when a law enforcement officer's actions rise to the level of a show of authority sufficient to constitute a seizure is "not always an easy one," *United States v. Black*, 675 F.2d 129, 135 (7th Cir.1982) (quoting *United States v. Viegas*, 639 F.2d 42, 44 (1st Cir.1981) and thus, the decision calls for the "refined judgment" of the trial court. *Black*, 675 F.2d at 129.

Officers Weaver and Truesdale heard the report of shots fired when it was broadcast by another police officer, Officer Quade.  Transcript of Suppression Hearing, January 3, 2006, Docket at 18, p. 7.[1]  According to the testimony of Officer Weaver, the only police officer involved in the incident who testified at the hearing, Officer Quade stated that the shots came from a direction just northeast of the police station.  *Id*.  Also according to Weaver, this would mean the shots came from the direction of a section of the Eden Green Apartment complex.  *Id*. at pp. 9 and 21.  The two officers, who were only a few blocks away, responded to the location from where the shots were purported to have been fired.  *Id*. at pp. 9-10.  As soon as they arrived, they noticed Jackson's black sport utility vehicle parked in a parking space with its lights on and engine running.  *Id*. at p. 10.  In extremely short order, the officers ordered Jackson out of his vehicle, patted him down, handcuffed him (after discovering the drugs in his pocket), and placed him in the back of their squad car.  *Id*. at pp. 12-14.

---

[1]  All subsequent references to the transcript of the suppression hearing will be referred to as "Tr. at p. ___ ."

In order to determine the legal validity of this encounter between the police and Jackson, the court turns first to an examination of whether this initial detention was justified under the Fourth Amendment.  In determining whether an encounter between a private person and the police amounts to a "seizure" for Fourth Amendment purposes, the court utilizes the objective standard articulated by the Supreme Court:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Florida v. Bostick*, 111 S.Ct. 2382, 2386 (1991)).  Thus, the law is well established that "if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement was restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred."  *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990) (quoting *United States v. Espinosa-Alvarez*, 839 F.2d 1201, 1205 (7th Cir.1987)).

Certainly, the nature of the police-citizen encounter can change from a voluntary encounter to an investigative detention if the police conduct changes and vice versa. Officer/citizen interactions are not static events, but often progress through the categories of encounters as the intrusiveness or length of the police activity increases.  The question here is whether, looking at the totality of the circumstances, the officers' initial encounter with Jackson was voluntary and whether the subsequent police conduct escalated the encounter to a point requiring reasonable suspicion to detain him further or to conduct a "pat down" search.  Under the circumstances of this case, the court concludes that the encounter was, virtually from its

inception, a "seizure" under the Fourth Amendment that required–at a minimum–a particularized

suspicion of criminal activity.[2]

It is certainly true that "law enforcement officers can approach an individual in a public

place, identify themselves as police officers, and ask the individual questions without violating

the Fourth Amendment." *Florida v. Royer,* 460 U.S. 491 (1983)).  Indeed, merely approaching

an individual in a public place and asking questions of the individual, including asking to

examine the person's identification is not a seizure implicating the Fourth Amendment.  *Florida*

*v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)).  Here, however, the

officers went beyond that conduct which is permissible in a voluntary encounter.

When Weaver and Truesdale initially approached Jackson's vehicle, Truesdale had his

weapon drawn and in the "low ready" position.  While Weaver testified that he could not recall

whether Truesdale had his gun drawn (Tr. at p. 24), the videotape of this entire incident,

recorded by the in-car camera in Truesdale's squad car, clearly shows that Truesdale did in fact

have his gun drawn.  Defendant's Exhibit E (videotape of incident on July 23, 2005).  In any

event, the parties also stipulated to this fact during the hearing.  Tr. at pp. 24-25.  The videotape

also shows that the police pulled up near Jackson's vehicle and shined their squad car's spotlight

directly at Jackson's driver side window.  Exhibit E.  While it is difficult to make out all of the

---

[2] In their respective briefs, the Defendant and the government discuss the facts and make
arguments in the context of both the "reasonable suspicion" standard and the more rigorous
"probable cause" standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny.  The
legal distinction between these two standards is not discussed in this Order, since, for the reasons
discussed at length herein, the court finds by a preponderance of the evidence that
*neither* standard was met in this case.  That is, since the court concludes that the police did not
even have a reasonable suspicion that would warrant the detention, pat-down, and arrest of
Jackson, it goes without saying that they had no probable cause to justify their actions.

statements, comments, and/or commands made by the officers, it is clear that either Truesdale or Weaver ordered Jackson place his hands up above his steering wheel, which he did immediately. *Id*. The officers exited their squad car and approached Jackson's vehicle–Truesdale with his weapon drawn although not pointed at Jackson. *Id*. Jackson was ordered to get out of his vehicle, apparently by Weaver who was approaching the driver side of Jackson's vehicle, and Jackson complied without protest. Jackson was immediately ordered to place his hands above his head, interlocking his fingers. *Id*. Weaver then conducted a pat-down search, purportedly to ensure that Jackson did not have a weapon on his person. *Id*. and Tr. at pp. 26-27. Weaver then felt what he claimed he immediately knew was drugs in Jackson's pant's pocket. Tr. at pp. 14-15. Weaver testified that he asked Jackson if he could remove whatever was in Jackson's pocket and that Jackson replied, "yes, go ahead." Tr. at p. 15. Once he removed the items and noticed that they were, in fact, drugs, Weaver handcuffed Jackson and placed him in the back of the squad car. Defendant's Exhibit E.

Looked at in isolation, the scenario just presented may not seem to present many problems. The police hear a report of shots fired from a general area in Eden Green. Weaver and Truesdale respond very quickly. They see Jackson parked in the area from where they believe the shots may have originated. They secure the scene quickly, conduct a protective pat-down of Jackson and find drugs. He is handcuffed and placed in the back of a squad car. In a subsequent search of Jackson's vehicle the police discover a handgun. Jackson is later transported to custody and the charges that are the subject of this case are filed. However, this case is anything but that simple and clear cut.

6

While it is undisputed that Jackson was cooperative throughout this incident, it is also undisputed (or at least there is no evidence to suggest) that he consented to the "investigation" or search of his person or vehicle.  Absent consent, the officers were required to justify their actions with some level of suspicion.  *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (a protective frisk or pat-down search, however brief, is both a search and a seizure for Fourth Amendment purposes and requires a minimal level of suspicion).  Indeed, *Terry* leaves no doubt that "to justify a warrantless pat-down search without probable cause, the officer must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others."  *United States v. Brown,* 188 F.3d 860, 864 (7th Cir. 1999) (citing *Terry*, 392 U.S. at 26-27).[12]

Under *Terry*, a person may be stopped for brief questioning and a pat-down search without a warrant if the officer can point to "a reasonable suspicion of criminal activity." "'Reasonable suspicion' is 'a quantum of proof less demanding than probable cause'...but a 'hunch' will not suffice....There must be 'some minimal level of objective justification for making a stop.' . . . The officer must be able to set forth 'specific and articulable facts' which, based on 'the totality of the circumstances--the whole picture,' are 'sufficient to give rise to [the] reasonable suspicion' of criminal activity. . . ."  *Brown*, 188 F.3d at 864.  A court is to take into account the entire set of circumstances surrounding the stop in determining whether the same violated *Terry*.  That is, "the whole picture must be taken into account in determining whether the police are justified in conducting a *Terry* stop, including the inferences and deductions made by a trained police officer."  *United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999). "Circumstances which appear innocent to the outside observer may suggest criminal activity to

experienced law enforcement personnel who may assess these circumstances in light of their experience." *Id.*

The Supreme Court has made it clear that an individual's presence in a "high crime area," standing alone, is not enough to support a reasonable, particularized suspicion of criminal activity. *Illinois v. Wardlow,* 528 U.S. 119,123 (2000) (citing *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). This notwithstanding, a location's characteristics are relevant in determining whether the circumstances are sufficiently suspicious to warrant further investigation. *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 144, 147-148, 92 S.Ct. 1921, 32 L.Ed.2d 612). Nervous or evasive behavior is another pertinent factor in determining reasonable suspicion, *United States v. Brignoni–Ponce*, 422 U.S. 873, 885 (1975) *,* as is the experience of the law enforcement agent. *United States v. Odum,* 72 F.3d 1279, 1284 (7th Cir. 1995). While the presence or absence of factors such as these aid the court in its assessment of the facts, this court is cognizant that "in reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences from suspicious behavior, and this Court cannot reasonably demand scientific certainty when none exists. Thus, the reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 124 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

In this case, the government hangs its hat on the fact that Officer Weaver testified that when he and Truesdale arrived at the scene, Jackson was the only person present. Thus, according to Weaver, a *Terry* detention was necessary, as was a pat-down search, in order to ensure that Jackson did not have an easily accessible weapon on him and did not present a danger to the officers. In explaining his and Truesdale's actions, Weaver testified as follows:

A.  We didn't see anybody else in the area at all or en route to that location.  We didn't see anybody running from the area either.

. . .

Q.  Now, why do you go to Mr. Jackson in his vehicle?

A.  He is the only one in the parking lot.  He is the one in the area.  As I said, there was nobody running from the area, nobody else in the vehicle or outside the apartments at the time.

Tr. at p. 11.  Weaver went on to testify as follows:

Q.  Was there any other reason to believe a gun might have been in the vehicle?

A.  We still had the original call that shots were fired.  *This was our suspect, the suspect we were inquiring about*.  He was the only one in the area.

Tr. at p. 18 (italics added). . . .

Q. . . . what made you think that Mr. Jackson was the shooter?

A.  He was the only one in the area.  It was 1:50 a.m. in the morning.  No one was around.  When we approached the area, no one was leaving the area either.

Q.  You are quite certain he was the only one there?

A.  Yes, sir.

Tr. at p. 25. . . .

Q. . . . Other than the report that there had been shots fired, did you have any facts known to you at the time that made you think that Mr. Jackson was engaged in criminal activity?

A.  Only the fact that he was the only one in the area where the shots were reported to come from, sir.

Tr. at p. 27. . . .

Q.  You did not personally observe [Jackson] do anything that made you suspicious that criminal activity was taking place?

A.  Just that he was in the area, sir.

9

Q.  Just that he was in the area?

A.  The only one in the area, sir. . . . Based on his cooperation at the time and the surprised look he gave us as we pulled in, I still wasn't sure that he was, in fact, the shooter.  But being the only one in the area at the time when no one else was leaving the scene, I conducted my pat-down in that manner.

Tr. at p. 28.

It could hardly be any clearer that the entire encounter between the police and Jackson occurred because the police claim Jackson was the "only one in the area" very soon after the radio report was made of shots having been fired from that vicinity.  But the court finds that Weaver's testimony on this crucially important point is not at all credible.

Jackson presented the testimony of two individuals who claimed to have been eyewitnesses to this entire incident from the precise moment that the police arrived on the scene. Not only do they dispute Weaver's allegation that no one else was present other than Jackson, they also refute his testimony on other key points.  Furthermore, the court's review of Defendant's Exhibit E, the videotape of this incident, also makes it clear that Weaver's testimony on certain key facts is not worthy of credence.

The first witness to testify on Jackson's behalf was William Holley.  Holley testified that he was outside at Eden Green Apartments when this incident occurred and observed virtually the entire thing.  Holley testified that he was standing outside of one of the Eden Green apartment buildings just across the parking lot from where the incident transpired.  He further testified that there were at least eight people present at the scene.  The relevant portions of Holley's testimony regarding this fact were as follows:

Q.  William, on the night of July 23, 2005, were you in–were you at the Eden Green apartment complex?

10

A.  Yes, sir.

Q.  Did you see my client get arrested?

A.  Yes, sir.

Q.  Where were you located?

A.  North, right across in front of Building 11 and Building 2, right here. [The witness pointed out his position on Defendant's Exhibit C, a photograph of the area where the incident occurred, which was posted on the court's electronic evidence display system during this testimony.]

Tr. at pp. 38-39. . . .

Q.  Were there other people there?

A.  It was, it was summertime, and the summertime is always a lot of people in Eden Green.  Outside, there was a lot of people outside in front of Building 11 when it happened.

Q.  And were they watching what was going on?

A.  They were watching.

Tr. at 39-40. . . .

Q.  Okay, William.  Now, just give, I guess your best estimate.  When the police pulled into that building there, the utility building,[3] how many people were present?

A.  It was at least, at least eight people across the front of Building 11.

Q.  Okay, was Darrell the only person at this end of, you know, in that parking lot?

A.  I can't remember, because there is another building right here.  That it was people standing out in front of that building, too. . . .

Tr. at p. 41. . . .

_____

[3]  It is not disputed (and indeed Exhibit E shows) that Jackson's vehicle was parked next to a utility building at Eden Green.

Q.  You are saying there is a lot of people around?

A.  Lot a people.  This is summertime.

Q.  Your conclusion that there is a lot of people around is just because it is summertime?

A.  I seen a lot of people out there, and I hang around there.  I know.

Tr. at p. 46.  In fact, Holley also testified that he was outside even before the police arrived and he heard the shots fired in the area.  He stated that he "was out there.  When it was fired, everybody hit the ground."  *Id*.

In addition, Jackson called as a witness Tocarra Whatley, a resident of Eden Green Apartments at the time of the incident.  The evidence revealed that Whatley's apartment is in a building directly adjacent to the parking lot in which this incident occurred.  In fact, when she pointed out the location of the incident on a photograph, she pointed to her car, which was parked in that same parking lot.  With regard to who was present during the search and arrest of Jackson, Whatley's testimony was as follows:

Q.  All right.  Were you there on July 23, 2005?

A.  Yeah.

Q.  Did you see Darrell get arrested?

A.  Yeah.

Q.  First, where were you?

A.  I was outside.  It was, it was a lot of people outside, like he said.  Um, actually, I was just coming from my car when he pulled in, when Mr. Jackson was pulling in.
. . .

Q.  Okay.  But you were right there when the officers drove in?

12

A.  Right, right.  I seen them do all that.

Q.  And what is your estimation of how many people in that area?

A.  In the Eden Green area?

Q.  Right in that immediate area where, that we are talking about.

THE COURT: Outside while this is going on.

THE WITNESS: Outside, probably like, it was a lot of people outside.

THE COURT: Well . . .

THE WITNESS: Probably 10, 12 people maybe.

Tr. at pp. 49-50.  Whatley testified that while the incident with Jackson was unfolding she went into her apartment to get a jacket, then returned outside to see that Jackson had been placed into the back of a squad car.  On cross-examination, the government's attorney asked Whatley if, when she came back outside her apartment, "that is when you have a lot of people coming by?" She responded, "No.  Lot of people was already outside."  Tr. at p. 53.

Having heard the testimony of Weaver, Holley, and Whatley, and having observed each witnesses' demeanor while testifying, the court finds that the testimony of Holley and Whatley was credible, while the testimony of Weaver was not.[4]  The court also finds that the

---

[4] Not only did Holley and Whatley appear to be credible witnesses with regard to the important issue of whether other people were present when the police pulled into Eden Green, but other parts of their testimony also conflicted directly with the testimony of Officer Weaver. The court's careful review of the videotape of this incident, Defendant's Exhibit E, reveals that Holley and Whatley testified accurately about certain facts while Weaver essentially got it all wrong.  For example, Weaver stated that additional reasons for the decision to order Jackson out of his vehicle and conduct a pat-down search included the fact that Eden Green was known to police as a "high crime area" and "high drug trafficking area," and because Jackson was "taller than I am and was considerably larger than myself and [Officer Truesdale]."  Tr. at pp. 12-13. The clear implication from this testimony and line of questioning is that Weaver had a legitimate concern for officer safety and therefore was justified in taking swift "control" of Jackson.

preponderance of the evidence establishes that Jackson was by no means the only person present at the scene when this incident unfolded and that there were several people present from the moment the police arrived.  Therefore, the position argued by the government to justify the approach, detention, search, and arrest of Jackson–and the justification of those actions testified to by Weaver in this court–did not exist.  What existed was Weaver's and Truesdale's speculation that Jackson, because he was parked in a vehicle with his lights and engine on, and because he allegedly had a "surprised" look on his face, must have been the person who fired the gun shots.  Acting on this impulse or "hunch," the officers pulled up to Jackson's SUV immediately upon arriving in the parking lot, ordered him out of his vehicle, patted him down, arrested him, and then searched his vehicle–all without an objective, reasonable suspicion to justify their actions.

---

However, when asked if any other officers were present while he conducted the pat-down, Weaver testified that he could not recall and that "[o]ther officers were en route to the location." Tr. at p. 13.  The videotape, however, shows that the squad car in which Weaver was riding (and Truesdale was driving) was actually the *second* police car to arrive at the scene.  The videotape shows that Weaver's and Truesdale's squad car followed directly behind another fully marked police cruiser into Eden Green Apartments, into the parking lot, and right up in front of Jackson's vehicle.  It is very difficult to believe that Weaver could not recall this fact, especially when he also testified that he reviewed the videotape and that it accurately depicted the events that took place on that morning.  Tr. at p. 24.

Weaver also testified that he and Truesdale arrived on the scene with their emergency lights activated.  Tr. at p. 23.  However, the court's review of Exhibit E clearly shows that neither the squad car that Weaver was riding in nor the one immediately in front of it had emergency lights on.  In fact, neither vehicle even appeared to have its headlights on at that point.  In the videotape, the first vehicle lights that are visible are those of Jackson's own truck. And the only other light that becomes obvious is the spotlight that is shined on Jackson's vehicle from the squad car in which Weaver was a passenger.  Both Holley and Whatley testified that the police did not have any lights on when they pulled into the parking lot and up to Jackson's vehicle.  Tr. at pp. 40, 49, and 53.  Once again, this seems to the court to be an obvious fact.  But Weaver's testimony was directly contrary to the rest of the evidence, which serves to further undermine his credibility (or, at the very least, create serious doubts as to his ability to recall accurately the events of the early morning of July 23, 2005).

In addition, the evidence establishes that the police, upon arriving in the parking lot at Eden Green, focused their attention immediately on Jackson.  Again, Weaver testified that "[t]his was our suspect, the suspect we were inquiring about."  But the question is why?  Given the court's finding that Jackson was *not*, in fact, the only civilian present in the immediate area, what then constituted "reasonable suspicion" to warrant the immediate detention and search of Jackson?  According to Weaver's own testimony, the police had absolutely no information that would lead them to focus either on Jackson (i.e., an African American male suspect) or his vehicle.  Weaver testified as follows:

Q.  Did Officer Quade or the dispatcher provide any description of the shooter?

A.  No, sir.

Q.  Did Officer Quade or dispatch state if a vehicle was used by the shooter?

A.  No, sir.

Tr. at pp. 25-26.  Thus, when responding to the general area of where the shots were reportedly fired, the police had no idea who they were looking for.  The did not know if the alleged shooter was male or female, black, white or another race, was on foot or in a vehicle, or any other descriptive information that might arguably justify their immediate suspicion of Jackson.

Not only did the police focus their attention and efforts (and show of force) on Jackson despite the fact that they had no apparent reason to do so, they also saw nothing when they approached him to indicate that he was involved in any criminal activity whatsoever.  Weaver readily admitted as much during his testimony.  On that point, Weaver testified as follows:

Q.  Did you see any weapons as you approached [Jackson]?

A.  No, sir.

15

Q.  You see any drugs as you approached him?

A.  No, sir.

Q.  You see anything on the ground as you approached the vehicle that made you say hey, that is–any suspect items on the ground?

A.  No, sir.

Q.  Did [Jackson] act in a threatening manner to you?

A.  Not at that time.  He was being cooperative.

Q.  Did he in any way attempt to take flight?

A.  Not at that time, sir. . . .

. . .

Q. . . . Other than the report that there had been shots fired, did you have any facts known to you at the time that made you think that Mr. Jackson was engaged in criminal activity?

A.  Only the fact that he was the only one in the area where the shots were reported to come from, sir.
. . .

Q. . . . You did not personally observe him do anything that would be considered criminal activity?

A.  No, sir.

Q.  You did not personally observe him do anything that made you suspicious that criminal activity was taking place?

A.  Just that he was in the area, sir.

Tr. at pp. 27-28.  So, not only did the police have absolutely no description of a person or vehicle

that might arguably have given rise to a reasonable suspicion that Jackson was either the shooter

or otherwise engaged in some criminal activity, they also did not *personally observe* Jackson do

anything at all suspicious.  By Weaver's own admission in this court, the only reason the police

16

approached Jackson in the parking lot at Eden Green was because he was there.

To the extent that the government is arguing that this was nothing more than a *Terry* type investigative stop or detention of Jackson (or that it merely began that way), the actions of the officers at scene, as shown in the videotape, contradict that argument.[5]  The videotape, Defendant's Exhibit E, includes video and audio.  There is also a digital time display on the tape that shows precisely how much time is elapsing as the events are unfolding.  The videotape shows the squad cars (again, *two* of them, not just Weaver's and Truesdale's car) driving quickly

---

[5]  Not only does the evidence not support any argument that this was nothing more than a *Terry* type investigative stop, but Weaver's own testimony makes it clear that it was much more. Weaver was asked whether Jackson was free to leave prior to the discovery of the drugs in his pocket.  On this point, Weaver testified as follows:

Q.  If Mr. Jackson wanted to leave at that point, if he wanted to get in his truck and drive away, would you let him do it?

THE COURT: At what point now, after the drugs had been found?

[DEFENSE COUNSEL]: Prior to finding the drugs, just prior to making the search of this person.

THE WITNESS: Had he wanted to, sir, we were still asking him questions regarding what happened.  He was the only one in the area.

THE COURT: So, the answer is no?  The question was, before you patted him down, had he said he was going to leave, would you let him leave?

THE WITNESS: No, sir.

Tr. at p. 30.  Thus, Weaver's own testimony appears to establish that this was more than a *Terry* investigatory stop or detention, since once an individual is not free to leave, even if he has not yet been arrested, a "seizure" of the person has occurred under the Fourth Amendment. *United States v. Odum*, 72 F.3d 1279 (7th Cir. 1995).

into the Eden Green Apartment complex with no lights on at 1:28:19 a.m.[6]  At 1:28:30 they turn

into the parking lot, drive up to Jackson's parked SUV and shine a spotlight directly into his

driver's side window.  At 1:28:35 Jackson, apparently responding to a command from one of the

officers, rolls down his driver's side window.  At 1:28:38 Jackson can be seen raising both his

hands above his steering wheel.  At 1:28:43 the officers, at least one with a weapon drawn (albeit

in the "low-ready" position) approach Jackson's vehicle.  At 1:28:55 Jackson is already out of

his vehicle with both arms on top of his head, standing just a few feet away from his driver's side

door, with Officer Weaver standing approximately behind him.  At 1:29:04 Weaver is

conducting a "pat-down" search of Jackson.  At 1:29:48 Jackson is placed in handcuffs, and at

1:30:13 he is being placed in the back seat of a squad car.  Thus, the amount of time that elapsed

between the point at which the squad cars pull up to Jackson's vehicle until he is placed under

arrest and handcuffed is a whole of 78 seconds.

      To sum up the evidence, the police respond to a report of shots fired from an area in Eden

Green Apartments.  They arrive and immediately descend on Jackson's vehicle, despite the fact

that they have no knowledge of any facts whatsoever that he is involved in any criminal activity.

They approach him and at least one officer has his weapon drawn at the "low-ready" position.

They order Jackson out of his vehicle, pat him down, discovery contraband, handcuff him and

arrest him, all in less than a minute and a half.  And their purported reason for doing so–that he

was the "only one in the area"–does not ring true.  This incident unfolded more like a sort of

---

[6]  There was some discussion during the suppression hearing that the clock in Officer
Truesdale's vehicle may not have been set on the precise time of morning.  However, it was
established that the police responded beginning at approximately 1:50 a.m. rather than 1:28 a.m.
However, this is not an issue and, even if it were, is not outcome determinative.

"ambush" of Jackson than an investigative stop.  And Weaver testified that after Jackson was told to exit his vehicle, but before he was handcuffed, the police "were still asking him questions regarding what happened."  Tr. at p. 30.  Given the evidence, especially the fact that only 78 seconds elapsed between the time the police pulled up to Jackson and the time he was handcuffed, the court seriously questions how Weaver or any officer on the scene was able to conduct any sort of questioning of Jackson.  The videotape does not show the police asking Jackson for his driver's license or any identification, and does not appear to show any officer asking him much of anything at all.  Rather, it appears that any "conversation" between Jackson and the police prior to the point at which he is handcuffed, consisted of Jackson merely following the commands of the officers to exit his vehicle and place his hands on top of his head.

Even when considering the commonsense judgment and experience of Officers Weaver and Truesdale, the court cannot conclude that their observations and the location of Jackson or his vehicle were enough to provide the police with a reasonable belief that Jackson was armed and dangerous, thereby justifying the pat-down or the manner in which the entire approach and subsequent arrest of Jackson took place.  The preponderance of the evidence, the standard required to be met when considering a motion to suppress,  is that Weaver and Truesdale saw Jackson sitting in his vehicle parked in a high crime area.  That is all.  But as stated above, it is very well established that the mere presence of a person in a high crime area is insufficient to support a reasonably suspicion of criminal activity or involvement.  *Illinois v. Wardlow*, 528 U.S. 119, 123.  Notwithstanding the fact that they heard a radio dispatch about shots having been fired in this vicinity of Eden Green, the officers saw no object, action, or movement which would

indicate that Jackson had a weapon or that he had fired any gun shots minutes earlier.  The officers had no information *whatsoever* that Jackson, or even a person fitting his description, was involved in the firing of any gun.  They had no information *whatsoever* that the person who fired the shots was driving, sitting in, or hiding in, a sport utility vehicle fitting the description of Jackson's vehicle.  (For that matter, they had no information that any kind of vehicle was involved.)  Thus, this court concludes that the officers had neither reasonable suspicion that criminal activity was afoot so as to warrant the detention and search (or even "pat-down") of Jackson, nor did they have a reasonable belief that Jackson was armed and dangerous to justify searching him.  In fact, the evidence completely fails to establish the "specific and articulable facts" necessary to justify the actions taken against Jackson.  *Brown*, 188 F.3d 860, 864 (7th Cir. 1999).  Accordingly, the search and arrest, and indeed even the initial detention of Jackson,[7] were in violation of the Fourth Amendment.

For this court to uphold the police conduct in this case would be to ratify a situation that is "likely to sweep many ordinary citizens into a generality of suspicious appearance...." *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir.1992) (concluding that the factors cited by the police in that case described "too many individuals to create a reasonable suspicion that this particular defendant was engaged in criminal activity"); see also *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492 (9th Cir.1994) (holding that reasonable suspicion cannot be based "on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped").  Indeed, in upholding the conduct of the

---

[7]  Assuming one could even argue that Jackson was ever "detained," since the evidence (especially the videotape), reveals that he was simply approached and arrested in a matter of a minute and a half.

officers, this court would provide a license for police officers to stop, question, and search

virtually anyone parked at the Eden Green Apartment complex simply because of their presence

in that area.   Moreover, this court is convinced that the particularized suspicion mandated by

*Terry* requires more than that which was found here.   The "surprised" look Weaver allegedly

observed on Jackson's face as the officers pulled up to him is so ordinary that it should not

possibly have aroused suspicion of criminal activity, even for a trained and experienced police

officer on the beat in a high crime area.   Although the court recognizes that an encounter with a

citizen (be it in a high crime area or elsewhere) can be fraught with danger, this fact alone will

not justify a pat-down of every citizen encountered by a police officer.   If it were so, the

protection offered to ordinary citizens by the Fourth Amendment would be illusory.


## CONCLUSION

Based on the foregoing, the Motion to Suppress filed by Defendant Darrell Jackson is

GRANTED.


Dated: May 25, 2006.


     /s/    William C. Lee     
          William C. Lee, Chief Judge
          United States District Court